IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-----------------------------------------------------x
                                         :
FRANCES PUDELER                          :        3:09 CV 1543 (JGM)
                                         :
v.                                       :
                                         :        DATE: DECEMBER 12, 2013
UNITED STATES OF AMERICA                 :
-----------------------------------------------------x

RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

        On September 29, 2009, plaintiff Frances Pudeler commenced this action under the Federal

Tort Claims Act ["FTCA"], 28 U.S.C. §§ 1346, 2671, against defendant United States of America,

arising out of injuries allegedly caused by the negligence of agents of the United States Department

of Homeland Security, Transportation Safety Administration ["TSA"], as a result of events that

occurred on May 26, 2007, as she passed through a security-inspection checkpoint at Bradley

International Airport in Windsor Locks, Connecticut.  (Dkt. #3).  On February 2, 2010, plaintiff filed

her Amended Complaint (Dkt. #15), and twenty-one days later, defendant filed a Motion to Dismiss

for lack of subject matter jurisdiction (Dkt. #16; see Dkts. ##17-31, 36), which motion was denied

by U.S. District Judge Janet Bond Arterton on September 30, 2010.  (Dkt. #38). See also 2010 WL

3926030.  On December 7, 2010, plaintiff filed her Second Amended Complaint (Dkt. #41; see

Dkts. ##39-40), and on January 21, 2011, defendant filed its Answer with affirmative defenses.

(Dkt. #42).

        On November 21, 2011, the parties consented to trial before this Magistrate Judge and the

case was transferred accordingly.  (Dkt. #49; see also Dkts. ##46-47).  On May 3, 2013, defendant

filed the pending Motion for Summary Judgment (Dkt. #71; see also Dkt. #81), with brief, exhibits

and affidavits in support.[1]  (See also Dkts. ##67-70).  On August 8, 2013, plaintiff filed under seal

---

[1]Attached to defendant's Motion are the following exhibits: copies of case law; Declaration of
Richard Schmid, signed on May 3, 2013 ["Schmid Decl."]; Declaration of Jennifer Marchitto, signed on

her brief, a Local Rule 56(a)1 Statement,[2] and exhibits in opposition to defendant's motion.  (Dkt. #84; see Dkts. ##79, 83; see also Dkts. ##72-78).[3]  On August 28, 2013, defendant filed its reply brief.  (Dkt. #85; see also Dkts. #80, 82).  On September 5, 2013, plaintiff filed under seal Supplemental Facts in Response to Defendant's Local Rule 56(a)1 Statement, along with seven additional exhibits.  (Dkt. #87; see Dkts. ##86, 88).[4]

For the reasons stated below, defendant's Motion for Summary Judgment (Dkt. #71) is granted.

## I. LOCAL RULE 56 STATEMENTS

As an initial matter, plaintiff failed to comply with Local Rule 56 of the Local Rules of Civil Procedure for the District of Connecticut.  Local Rule 56 requires that a party filing a summary judgment motion attach a "concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried."  D. CONN. L. CIV. R. 56(a)1.  Local Rule 56(a)2 requires that a party opposing a motion for summary judgment must then file a document entitled

---

May 2, 2013 ["Marchitto Decl."]; copy of "Checkpoint Throughput-By-Hour-May 20, 2007-May 26, 2007"; copy of excerpts of deposition of Dolores Martell, taken on October 21, 2011 and December 17, 2012 ["Martell Depo."]; and copy of excerpts of deposition of plaintiff, taken on November 17, 2011 ["Plaintiff's Depo."].

[2]See Section I. infra.

[3]Attached to plaintiff's brief, filed under seal, are the following ten exhibitis: affidavit of Frances Pudeler, sworn to May 6, 2010 ["Plaintiff's Aff't"] (Exh. 1); copy of Quinnipiac Law Review Article, Summer 2000 (Exh. 2); copy of case law (Exh. 3); copy of Statement by Linda Blair, dated December 21, 2008 (Exh. 4); additional excerpts from Plaintiff's Depo. (Exh. 5); copy of excerpts from the Screening Management Standard Operating Procedures ["SOP"] for aviation security (Exh. 6); copy of "Safety Class Record" completed by Dolores Martell and Linda Blair (Exh. 7); copy of Entry and Exit Point Control documents (Exh. 8); copy of Checkpoint Overview documents (Exh. 9); and copy of Standard Operating Procedures for TSA (Exh. 10).

[4]Attached to Dkt. #87, filed under seal, is a copy of the Department of Homeland Security Sensitive Security Information Cover Sheet, another copy of the Screening Management SOP (Exh. 6); another copy of the Entry and Exit Point Control documents (Exh. 8); another copy of the Checkpoint Overview documents (Exh. 9); additional excerpts from Plaintiff's Depo. (Supp. Exh. 11); and additional excerpts from the Martell Depo. (Supp. Exhs. 12-14).

"Local Rule 56(a)2 Statement," which statement sets forth "in separately numbered paragraphs meeting the requirements of Local Rule 56(a)3 and corresponding to the paragraphs contained in the moving party's Local Rule 56(a)1 Statement whether each of the facts asserted by the moving party is admitted or denied."  D. CONN. L. CIV. R. 56(a)2.   The opposing party must also include a "list of each issue of material fact as to which it is contended there is a genuine issue to be tried." Id.  Each statement of material fact in a Local Rule 56(a)1 or Local Rule 56(a)2 Statement, as well as each denial in the opposing party's Local Rule 56(a)2 Statement, "must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial."  D. CONN. L. CIV. R. 56(a)3.  When a party fails to deny material facts set forth in the moving party's 56(a)1 Statement, and when those facts are supported by evidence in the record, those facts are deemed admitted, or the Court may impose sanctions, including, when the opponent fails to comply, "an order granting the motion if the undisputed facts show that the movant is entitled to judgment as a matter of law."  Id.; see Miron v. Town of Stratford, 11 CV 446 (VLB), 2013 WL 5448470, at *1 (D. Conn. Sept. 30, 2013); McAllister v. Price Rite, 09 CV 1888 (VLB), 2013 WL 5187036, at *1 (D. Conn. Sept. 13, 2013); SEC v. Global Telecom Servs. LLC , 325 F. Supp. 2d 94, 108-09 (D. Conn. 2004)

In this case, plaintiff, the opposing party, erroneously filed a Local Rule 56(a)1 Statement within which is four enumerated statements, three of which are supported by citations to attached exhibits.  (Dkt. #84, at 7).   Plaintiff then filed a supplemental response in which she lists eleven supplemental facts with citations to attached exhibits, which "are intended to [s]upplement the [p]laintiff's Local 56(a)1 Statement of Facts set forth in her Objection to Motion for Summary Judgment . . . ."  (Dkt. #87, at 3-5 & n.1)(emphasis omitted).  In the absence of a Local Rule 56(a)2 Statement, in the absence of a denial of facts set forth in defendant's 56(a)1 Statement, and

3

in the absence of a citation to admissible evidence to support one of plaintiff's statements not in dispute,[5] the Court will deem admitted defendant's undisputed material facts. D. CONN. L. CIV. R. 56(a)3; see Reynolds v. Town of Suffield, 3:10 CV 1528 (JBA), 2012 WL 3135896, at *1, n.1 (D. Conn. July 31, 2012).

Moreover, it is well-settled that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." Hayes v. New York City Dept. of Corr., 84 F.3d 614, 619 (2d Cir. 1996), citing Perma Res. & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969). See also Security Ins. Co. of Hartford v. Trustmark Ins. Co., 217 F.R.D. 296, 297 (D. Conn. 2003). This rule exists because "[i]f a party who has been examined at length at a deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, . . . the utility of summary judgment as a procedure for screening out sham issues of fact" would be "greatly diminish[ed]." Perma, 410 F.2d at 578 (citations omitted). Plaintiff's affidavit here contains specific details as to the alleged "bottleneck" that do not appear in her deposition transcript, although they do appear in her complaints. (Compare Plaintiff's Aff't ¶¶ 9-11; Second Amended Compl. ¶¶ 17-22 with Plaintiff's Depo. at 82-83).

## II. FACTUAL BACKGROUND

The following facts relevant to defendant's Motion for Summary Judgment are undisputed or admitted unless otherwise noted.

On May 26, 2007 at about noon, plaintiff passed through TSA Screening Checkpoint A2 in Terminal A at Bradley International Airport ["BDL"], in Windsor Locks, Connecticut. (Defendant's

---

[5]The "failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted in accordance with Rule 56(a)1." D. CONN. L. R. CIV. P. 56(a)3.

56(a)1 Statement ¶ 1; Second Amended Compl. ¶ 9).   That date, May 26, 2007, was the Saturday

of Memorial Day Weekend that year.  (Defendant's 56(a) Statement ¶ 2; Second Amended Compl.

¶¶ 9, 11).  At the time, plaintiff was employed at Paradise Stores, which is located in the sterile

area of the airport.  (Defendant's 56(a) Statement ¶ 3; Second Amended Compl. ¶ 9; Plaintiff's

Depo. at 28).[6]  Additionally, at the time of the incident, TSA operated and managed checkpoint A2

at BDL.  (Defendant's 56(a) Statement ¶¶ 4, 8; Schmid Decl. ¶ 24; Second Amended Compl. ¶ 9).

As plaintiff was going through the checkpoint, she was given directions by an employee of

TSA.  (Defendant's 56(a) Statement ¶ 5; Plaintiff's Depo. at 30-31).   After plaintiff passed through

the Walk Through Metal Detector, she waited for the person or people ahead of her to clear some

area so she would have room to put the change and other items in her pocket.  (Defendant's 56(a)

Statement ¶ 6; Plaintiff's Depo. at 87).  Plaintiff then walked adjacent to the conveyor belt when

her right foot got caught in the leg of the table and she fell.  (Defendant's 56(a) Statement ¶ 7;

Plaintiff's Depo. at 87).

Plaintiff did not know how crowded it was when she passed through the checkpoint.

(Defendant's 56(a) Statement ¶ 10; Plaintiff's Depo. at 28, 30).  Plaintiff was of the view, however,

that there were probably four people in line in front of her and that she did not pay much attention

to the number of people behind her.  (Defendant's 56(a) Statement ¶ 11; Plaintiff's Depo. at 28,

82).  One hundred and forty-three people passed through checkpoint A2 between 11:00 a.m. and

noon on May 26, 2007, and another one hundred twenty people passed through there that day

from noon to 1:00 p.m.  (Defendant's 56(a) Statement ¶¶ 12-13; Marchitto Decl. ¶ 7 &

attachment).  No passenger filed a complaint with the Claims Management Branch related to a

---

[6]Defendant's 56(a) Statement also refers to page 27 of plaintiff's deposition, but that page was
not included in any of the exhibits.

physical injury occurring at any checkpoint at BDL from May 2006 until the time of the incident giving rise to this lawsuit.  (Defendant's 56(a) Statement ¶ 18, Schmid Decl. ¶ 25).

III. DISCUSSION

A. SUMMARY JUDGMENT STANDARD

The standard for summary judgment is well established.  The moving party is entitled to summary judgment if it demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  Upon motion, following adequate time for discovery, Rule 56(c) requires that summary judgment be entered against a party:

> who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

This showing may be made by "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any."  FED. R. CIV. P. 56(c).  "On summary judgment the inferences to be drawn from the underlying facts contained in the [moving party's] materials must be viewed in the light most favorable to the party opposing the motion."  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970), quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).  "If reasonable minds could differ as to the import of the evidence, . . . the moving party simply cannot obtain summary judgment."  R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997)(citations & internal quotation marks omitted).  Thus, the party moving for summary judgment must "carry its burden of showing the absence of any genuine issue of fact."  Adickes, 398 U.S. at 153.

6

B. PARTIES' ARGUMENTS

In its motion, defendant asserts that plaintiff's claim is barred because the government has not waived sovereign immunity under the FTCA, as the manner in which the TSA operates the checkpoint is subject to the Discretionary Function Exception ["DFE"]; because there is no private party analog for the government's function of airport security, defendant is exempt from liability under the FTCA; defendant acted reasonably in how it ran the checkpoint, and thus there was no breach of duty; and defendant was not aware of an allegedly unsafe condition at the checkpoint, nor was there one.  (Dkt. #71, Brief at 4-19).

Plaintiff responds that if Congress intended the exceptions to the waiver of sovereign immunity to insulate TSA, it would have exempted TSA from the FTCA, which it did not; the Court is "encouraged" to "look far 'afield'" to find similar private sector actors; and Connecticut tort law provides for liability.  (Dkt. #84, Brief at 8-15,17-40).  In its reply brief, defendant asserts that plaintiff fails to identify a specific mandatory directive governing the operation of the TSA screening checkpoint at BDL that defendant breached; the agency's conduct in operating the screening checkpoint is a permissible exercise of agency judgment such that plaintiff's tort claim is barred by the DFE; and even if the court were to determine that the DFE did not apply to the challenged conduct, there is no evidence that defendant breached its duty to plaintiff in this instance.  (Dkt. #85, at 1-5).

C. FEDERAL TORT CLAIMS ACT AND THE DISCRETIONARY FUNCTION EXCEPTION

The FTCA waives the United States' sovereign immunity from suit in federal court for its employees' negligence, making it liable for:

> injury or loss of property, or personal injury or death caused by the negligent or
> wrongful act or omission of any employee of the Government while acting within the
> scope of his office or employment, under circumstances where the United States,
> if a private person, would be liable to the claimant in accordance with the law of the

place where the act or omission occurred.

28 U.S.C. § 1346(b)(1); see United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 807-08 (1984)["Varig Airlines"]. In addition, the United States is liable with respect to tort claims "in the same manner and to the same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 2674.

There are certain exceptions to the waiver of sovereign immunity imposed by the FTCA, including the discretionary function exception.  The DFE provides that the FTCA does not apply to "any claim based upon . . . the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).  This exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." Varig Airlines, 467 U.S. at 808. As the Second Circuit explained some thirteen years ago, the U.S. Supreme Court "has handed down a series of decisions clarifying the scope of the DFE[, and] [t]he Court's decisions in Berkovitz v. United States, 486 U.S. 531 (1988), and United States v. Gaubert, 499 U.S. 315  (1991), establish the framework for evaluating whether particular governmental conduct falls under DFE." Coulthurst v. United States, 214 F.3d 106, 108 (2d Cir. 2000).  The Berkovitz-Gaubert test explains that the DFE bars suit only if two conditions are met: "(1) the acts alleged to be negligent must be discretionary, in that they involve an 'element of judgment or choice' and are not compelled by statute or regulation and (2) the judgment or choice in question must be  grounded in 'considerations of public policy' or susceptible to policy analysis." Coulthurst, 214 F.3d at 109, quoting Gaubert, 499 U.S. at 322–23; Berkovitz, 486 U.S. at 536–37. The basis for the DFE was Congress' desire to "prevent judicial 'second-guessing' of legislative and administrative decisions

grounded in social, economic, and political policy through the medium of an action in tort." Varig Airlines, 467 U.S. at 814.  "The exception, properly construed, therefore protects only governmental actions and decisions based on considerations of public policy." Berkovitz, 486 U.S. at 537, citing Dalehite v. United States, 346 U.S. 15, 36 (1953)("Where there is room for policy judgment and decision there is discretion.").  See also Pudeler, 2010 WL 39236030, at *2-3.

### 1.  DISCRETIONARY POLICIES AND PRACTICES OF TSA

Under the first prong of the test, the DFE "will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow[]" such that "the employee has no rightful choice but to adhere to the directive." Berkovitz, 486 U.S. at 536. It is necessary, therefore, to examine the "nature of the conduct[,]" Gaubert, 499 U.S. at 322, as it is the "nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." Varig Airlines, 467 U.S. at 813. "Negligence . . . is irrelevant to our inquiry at this point. It is the governing administrative policy, not the [Governmental agency's] knowledge of danger, that determines whether certain conduct is mandatory for purposes of the discretionary function exception." Rosebush v. United States, 119 F.3d 438, 442 (6th Cir. 1997)(citation omitted).

According to plaintiff, the nature of the conduct at issue is a TSA employee's failure to appropriately control the flow of individuals through the airport's security checkpoint, resulting in a "bottleneck" in the area where people exiting the screening machine gather their belongings. (Dkt #84 at 7-8, citing Plaintiff's Aff't, ¶ 12).[7]  Defendant contends that there is no federal statute, regulation or policy specifically prescribing a course of action mandating how the TSA must operate a checkpoint, and thus the first prong of the DFE is met.  (Dkt. #71, Brief at 7-10).

---

[7]See Section I supra.

9

By statute, the head of the TSA, the Under Secretary for Transportation for Security, is "responsible for day-to-day Federal security screening operations for passenger air transportation and intrastate air transportation under sections 44901 and 44935[.]" 49 U.S.C. §§ 114(b)(1) & (e)(1). The Under Secretary shall "provide for the screening of all passengers and property . . . that will be carried aboard a passenger aircraft . . . ." 49 U.S.C. § 44901(a).  In his role, the Under Secretary shall "develop standards for the hiring and retention of security personnel; . . . train and test security screening personnel;" and ensure that this occurs "at all airports in the United States where screening is required under section 44901[.]" 49 U.S.C. §§ 114(e)(2)-(4).  Additionally, the Under Secretary must "assess threats to transportation;" "develop policies, strategies and plans for dealing with threats to transportation security;" "enforce security-related regulations and requirements;" and "oversee the implementation, and ensure the adequacy, of security measures at airports[.]" 49 U.S.C. §§ 114(f)(2), (3), (7) & (11).  Additionally, the Under Secretary "shall prescribe standards for the employment and continued employment of, and contracting for, air carrier personnel and, as appropriate, airport security personnel." 49 U.S.C. § 44935(a).  These standards require a training plan for all security screening personnel. 49 U.S.C. § 44935(g).

TSA operates Security Screening Checkpoints ["checkpoints"] at airports, including checkpoint 2 at BDL.  (Schmid Aff't ¶¶ 8, 24).  Congress has dictated that passengers must be screened prior to entering a "sterile area" or "board[ing] an aircraft[.]" 49 C.F.R. § 1540.107(a); see also 49 C.F.R. § 1540.105(a)(persons may not tamper with procedures or enter the sterile area without complying with procedures).  Defendant is correct insofar as it points to the absence of statutes or regulations relating to how the screening must be taken, how to control the flow of people through a security entry or exit lane, or, for example, how to "address an unsafe condition" at the checkpoint, but rather regulation of this type of conduct is left to the TSA's discretion.  (Dkt.

10

#71, Brief at 7, 9; see also Schmid Decl. ¶¶ 8-23).   As explained by the D.C. Circuit, "Congress generally has left it to the agency to prescribe the details of the screening process, which the TSA has documented in a set of Standard Operating Procedures not available to the public." Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec., 653 F.3d 1, 3 (D.C. Cir. 2011).   The TSA uses the Standard Operating Procedures ["SOP"], filed here under seal, as a guide for its employees  to properly screen passengers, carry-on luggage, and checked baggage, while making sure to provide an orderly process and a safe environment for the  public.   However, the SOP does not dictate how to achieve these objectives, nor do the procedures pertain to already-screened persons collecting their belongings after passing through the screening machine.

Richard Schmid, the Assistant Federal Security Director-Screening at Bradley Airport, avers that the "manner in which TSA chooses to manage and operate the checkpoints is within its discretion using best judgment consistent with carrying out TSA's mission of ensuring secure air travel[,]" and this "discretion and flexibility afforded to TSA agents allows them to balance agency resources with the policy interests of the agency's objectives to uncover threats to national security."  (Schmid Decl. ¶¶  11, 16).   Since there is no "specific manner" set forth, the TSA's "decision[s] as to the precise manner" in which its employees conduct themselves here falls within the discretionary function exemption. Rosebush, 119 F.3d at 442 (emphasis in original & multiple citations omitted).

The decision in Rao v. United States, No. 08-12027-MBB, 2010 WL 3607143 (D. Mass. Sept. 9, 2010) is directly on point, where the plaintiff was injured at Logan International Airport by tripping over a divesting bin left on the floor by another passenger after both of them had cleared security.  2010 WL 3607143, at *1-2 & n.2.  At Logan, and all other airports with security, there is usually a TSA employee whose job is to collect these bins as passengers retrieve their belongings,

11

and then to return them to the front of the checkpoint, which is a "mandatory part" of that job

assignment.  Id. at *2. In Rao, the plaintiff argued that this "mandatory policy" prevented

defendant from invoking the DFE.  Id. at *3-4.   However, after reviewing the statutory and

regulatory provisions addressed above, id. at *4-6, U.S. Magistrate Judge Marianne Bowler held that

the "statutes and regulations endow TSA with the discretion to determine the number of screeners

above and beyond" those operating the X-ray machines, and she further observed that the TSA

regulations "are silent with respect to the use of divesting bins or any other kind of repository

equipment for a passenger's accessible property."  Id. at *5.  Thus, Judge Bowler held statutory

and regulatory silence, "coupled with the focus upon the X-ray . . . equipment, affords TSA

considerable if not unbridled leeway to determine the manner in which passengers will collect their

carry-on property after it passes through security." Id. (multiple citations omitted).  Judge Bowler

therefore held, as this Magistrate Judge also holds here, that the statutes and regulations allow the

TSA leeway in how to conduct its functions at checkpoints, which necessarily makes the conduct

discretionary, so that defendant satisfies the first prong of the test.  Id. at *6.  See also Pudeler,

2010 WL 39236030, at *3-4.[8]

---

[8]In her September 2010 Ruling, Judge Arterton specifically held that based upon declarations
from TSA supervisors, "the challenged TSA conduct could not have been ministerial and was
discretionary."  2010 WL 39236030, at *3, n.4.

Defendant's Motion to Dismiss was denied nonetheless, because plaintiff's allegations could, at
that time, "be interpreted in more than one way[,]" namely that the "TSA agents at BDL decided not to,
or could not respond to the overcrowding because they were focused on monitoring air travelers and
looking for potential threats on a busy holiday weekend," or alternately, "it could be inferred that TSA
agents stood idly by, indifferently watching as a dangerous situation developed before their eyes and
doing nothing to mitigate the resulting risk."  Id. at *4.  Judge Arterton held that "[t]he former situation
would directly implicate policy-decisions: TSA's mission is air-travel security, and the agents' conduct,
even if negligent, resulted from a judgment-call or decision to focus their resources and energy on
uninterrupted screening of all passengers, and the DFE would bar jurisdiction."  Id.   Judge Arterton
continued, however, that "[p]laintiff's complaint . . . does not compel only that reading, and . . .
[t]herefore, at this initial stage, the Court will not read [p]laintiff's narrowed negligence claim as
definitively barred by the DFE."  Id.

2. TSA'S POLICY BASED FUNCTIONS

Conduct alleged under the first prong of the analysis is often susceptible to multiple interpretations;[9] thus, "[p]olicy considerations . . . remain the touchstone for determining whether the discretionary function exception applies." Andrulonis v. United States, 952 F.2d 652, 654 (2d Cir. 1991), cert. denied sub nom. N.Y. State Dep't of Health v. Andrulonis, 502 U.S. 1204 (1992). Even if conduct is considered discretionary in nature, the analysis under the second prong of the test looks to whether the act is "based on the purposes that the regulatory regime seeks to accomplish." Coulthurst, 214 F.3d at 110 (citation & internal quotations omitted).  If not, the action is not the "kind of considered judgment 'grounded in social, economic, and political policy' which the DFE is intended to shield from 'judicial second-guessing.'" Id. at 111, citing Varig Airlines, 467 U.S. at 814.

Defendant contends that "[d]ecisions on how to operate a checkpoint necessarily implicate policy considerations such as effectuating national security goals and policies, ensuring commercial air travel safety, and the consideration of feasible and resource allocation." (Dkt. #71, Brief at

_____

[9]For example, U.S.  Bureau of Prisons Guidelines require prison officials to inspect a prison gymnasium and assess safe arrangement and use of equipment; however, the "Guidelines contain no instructions as to the method to be followed in inspecting the machine that caused [plaintiff's] injury or the frequency of inspections." Coulthurst, 214 F.3d at 108. Thus, where the "operative words of the complaint-'negligence and carelessness' in the 'fail[ure] to diligently and periodically inspect the weight equipment and cable'-encompass the possibility of various different types of careless and negligent conduct," the Second Circuit necessarily examined whether the conduct in question involved a policy decision. Id. at 109-10.  In that case, the Second Circuit remanded the case back to the district court, after concluding that plaintiff's "negligent maintenance" claim was "susceptible to various readings[]" and that the complaint was broad enough to cover both a "negligence and carelessness" claim, and to cover a negligence claim involving discretionary conduct unrelated to plausible policy objectives, such as a claim against an official who was distracted or inattentive or too "lazy" to notify the appropriate authorities of the frayed cable on the gym equipment, which would fall outside the DFE exception. Id. at 109, 111.

The Second Circuit added that its decision "does not necessarily mean that plaintiff is entitled to trial on the basis of an ambiguous complaint[,]" and that if plaintiff was "unable to offer sufficient evidence to establish a triable issue of fact on any theory of negligence outside the scope of the DFE, then the United States will be entitled to judgment." Id. at 111.  This holding in Coulthurst was similar to that reached by Judge Arterton in ruling upon defendant's Motion to Dismiss.  See note 8 supra.

10)(citations omitted).  This is a broad statement, akin to the government's argument before the Second Circuit in <u>Andrulonis</u>.  In that case, while a federal government scientist was supervising an experiment for the Center for Disease Control ["CDC"], a laboratory worker under his supervision was exposed to a strain of rabies that permanently injured the worker.  952 F.2d at 653.  The Second Circuit rejected the government's assertion that the scientist's action "to allow the experiment to proceed was necessary to fulfill policy objectives of the CDC. . . ."  <u>Id.</u> at 655.  The Second Circuit observed that "the government's argument cuts too broad a swath.  Its attempt to sweep all of [the government scientist's] acts and omissions under the rug of broad CDC policy would effectively insulate virtually all actions by a government agent from liability, excepting only those where the agent had acted contrary to a clear regulation."  <u>Id.</u>  However, <u>Andrulonis</u> is distinguishable from this case, which is much narrower in focus.

In this case, the decision at issue concerns the number of people allowed to pass through a magnetometer, or the flow of which the magnetometer operator is authorized to stop. (Martell Depo. at 41).  TSA employees receive training on whether or when to stop this flow; the flow of people is stopped when the machine alarms, and is stopped when there are a "number of people entering and picking up their property, to avoid congestion." (<u>Id.</u>).  Defendant contends that the TSA's "mission" is therefore furthered by ensuring TSA employees at security checkpoints focus on security issues rather than potential injuries resulting from equipment of the checkpoint. (Dkt. #71, Brief at 10-11).  Plaintiff contends that her action is "not based upon the government's policy behind the security checkpoint but the negligent operation of the checkpoint."  (Dkt. #84, Brief at 19-20).[10]  "Decisions regarding airport security are oftentimes matters of discretion that do not

---

[10]However, even if plaintiff succeeded in claiming that DFE is not applicable, plaintiff has failed to prove that the TSA breached its duty of care when she pass through the checkpoint.  Her description of the events undermines her claim that the TSA breached a duty. Plaintiff testified at her deposition that there were probably four people in line in front of her and that she did not pay much attention to the

provide a basis for an FTCA claim."  <u>Rao</u>, 2010 WL 3607143, at *6 (citations omitted).    Just as Judge Bowling observed, "It is not this court's role to second guess the layout of TSA security checkpoints, nor is it within the purview of this court to determine" the process by which passengers pass through the magnetometer, nor should the court "determine the appropriate personnel allocation throughout a security checkpoint area."  <u>Id.</u> at *8.   These are agency operations that fall within the "realm of a discretionary function" and they "require a balancing . . . . including specifically the trade-off between greater safety and greater . . . effectiveness."  <u>Id.</u> (citation omitted).   The conduct at issue in plaintiff's negligence claim is discretionary and is susceptible to policy related judgments of TSA regarding how to structure the security checkpoints. Accordingly, plaintiff's claim is barred under the DFE of the FTCA.

    D.  OTHER ARGUMENTS

       In light of the conclusion reached in Section II.C. <u>supra</u>, there is no need to address the other arguments raised by the parties.

---

number of people behind her. (Plaintiff's Depo. at 28, 82).  In response, defendant offers the "passenger metrics" which "prov[e] that there was no bottleneck at the checkpoint[.]" (Dkt. #71, Brief at 16-17; see Marchitto Decl., Exh. A). The metrics indicate that during the time frame when plaintiff passed through the security checkpoint, the number of individuals passing through the checkpoint was "low volume" both in comparison to the number of individuals passing through between other one-hour windows of time that day or on other days.  (See Dkt. #71, Marchitto Decl. ¶ 7 & Exh. A). The number of people the TSA employee operating the exit lane allowed to pass through the magnetometer machine at the time of plaintiff's fall, however, is relevant to whether or not defendant had notice of the allegedly unsafe bottleneck plaintiff alleges formed at that time.  Plaintiff provides no evidence that the number of people allowed through the exit lane at the same time as she was more than four or five, nor that defendant would have noticed that these people created a dangerous condition as they went to gather their belongings.

<u>IV. CONCLUSION</u>

For the reasons stated above, defendant's Motion for Summary Judgment (Dkt. #71) is

<u>granted</u>.[11]

Dated this 12th day of December, 2013, at New Haven, Connecticut.


   /s/ Joan G. Margolis USMJ   
Joan Glazer Margolis
United States Magistrate Judge

---

[11]Tragically, plaintiff's counsel, David Marmelstein, passed away suddenly shortly after he filed his briefs here.  Defense counsel is asked to ensure that the trustee appointed to process Attorney Marmelstein's business is made aware of this ruling.

16